IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ROBERT COTTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:04-cv-447-F |
| ) | (WO) |
| HOSPITAL HOUSEKEEPING ) | |
| SYSTEMS, LTD., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Cotton (hereinafter "Cotton") brings suit against his former employer Hospital Housekeeping Systems, Ltd. (hereinafter "HHS") alleging that HHS discriminated against him in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et. seq.*, by terminating his employment on September 4, 2003. Cotton further alleges that HHS violated the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 *et. seq.*, by not compensating him for overtime work. This cause is before the Court on Defendant's Motion for Summary Judgment (Doc. # 25).

**I. Jurisdiction and Venue**

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 12101 *et. seq.* (ADA), and 29 U.S.C. § 201 *et. seq.* (FLSA). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations of each.

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of

the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### III. Facts

HHS provides housekeeping services to medical facilities, such as hospitals and physician office buildings. In August 2001, HHS entered into a contract with Baptist Health Systems to provide housekeeping services at various locations in the Montgomery, AL area, including the Baptist East campus and the Baptist South campus. Under the terms of the contract, HHS offered employment to the employees of the prior housekeeping services provider. These employees officially became HHS employees on September 1, 2001. Cotton was one of these employees.

Cotton claims that has been diagnosed with both Down's Syndrome and mental retardation.[1] For much of his life, he lived with his aunt, Luvenia Gray. He has lived with his brothers, Ronald and Donald Marlow, for the last nine or ten years. He splits the living expenses with them and shares chores around the house, such as mowing the yard and taking out the trash. He generally takes care of his own money, but is occasionally helped by Gray.

---

[1] HHS disputes these diagnoses. A letter from the Social Security Administration dated April 27, 2004 states that Cotton has received disability payments because of mental retardation. No evidence has been submitted showing that Cotton has been diagnosed with Down's Syndrome.

For instance, he conducts his own transactions at the bank, but may ask Gray to verify the amount of money he received. He has a very limited ability to read and does not have a driver's license.

Cotton attended the McInnis School, a school for individuals with disabilities, where he was trained to do janitorial services. While at McInnis, he worked at one of Baptist's hospitals. In 1985, he was hired as a permanent full-time employee of Baptist. At some later point in time, Baptist began outsourcing its housekeeping services. Baptist outsourced its housekeeping services to two other companies prior to entering into the contract with HHS. Gray claims that Cotton had no problems with Baptist or the two companies prior to HHS and had received satisfactory evaluations for the first fifteen years of his employment.

At the time HHS took over Baptist's housekeeping services, Cotton was working as a floor technician at the Baptist East campus. His job duties consisted of emptying the trash, cleaning the restrooms, and mopping and vacuuming the floors. He would move around the building a lot, cleaning different areas on different days of the week.

Gary claims that during a meeting that occurred several months after Cotton became an HHS employee, she informed an HHS supervisor of Cotton's disability. She told the supervisor that HHS needed to look at Cotton and talk to him slowly in order for him to understand what they were saying. She also told the supervisor to call her if Cotton did not understand what HHS was trying to tell him. In addition, she claims to have provided HHS with a letter, stating that in the past Cotton had received Social Security payments due to

4

mental retardation.

In 2002, Justin Clarke became Cotton's supervisor. Clarke would write Cotton a note explaining what he needed to do and Cotton would then perform those functions. During the time Clarke was his supervisor, Cotton received several oral warnings and one written warning concerning his job performance. On January 20, 2003, Cotton was terminated by Clarke for not performing his job satisfactorily. Specifically, Clarke told Cotton that the areas behind the doors were not swept, there were papers on the floor, no mopping was being done, and that buffing was not being performed adequately.

After Cotton was terminated, he and Gray met with Steven Flanagan, the HHS systems director of the Baptist facilities in Montgomery. During the meeting, Flanagan indicated that he would rehire Cotton because Clarke had not properly followed HHS's procedures when documenting Cotton's work performance and the counseling given to Cotton following the disciplinary actions. On January 28, 2003, Cotton was rehired, but was moved to the Baptist South campus so that he would not remain under Clarke's supervision.

When Cotton was rehired, his new job title was "elevator technician" and his supervisor was Marty LeMar. His job duties consisted of sweeping, mopping, and buffing the elevator floors; cleaning the inside of the elevator doors; cleaning the light covers, and; cleaning between the tracks of the elevators. These job functions required the use of a detail brush and a putty knife. Cotton alleges that instead he was given a toothbrush and a butter knife to perform his job. Flanagan testified that he was not aware of Cotton being given a

toothbrush and butter knife, but that it could have happened.  Cotton was trained on this job for four weeks by another HHS employee, then began to clean the elevators alone.  He was required to clean each elevator at least once daily.  Each elevator was inspected during the evening shift, and sometimes again the next morning.  Inspections of various parts of the hospital were conducted each morning by HHS and/or hospital personnel.  This means that a particular elevator may not have been inspected immediately after being cleaned, but was usually inspected sometime within the same shift.  According to Flanagan, the inspections were to look for built-up dirt and grime, not loose dirt or spills that could have occurred in between the time the elevator was cleaned and the time of inspection.

On May 8, 2003, Cotton received counseling and training from LeMar on how to properly perform his duties.  On May 13, 2003, as a result of inspections, LeMar verbally warned Cotton that he was not performing his duties satisfactorily, specifically that he needed to improve the manner in which the tracks of the elevators were being cleaned.  On June 24, 2003, LeMar again counseled and trained Cotton on properly performing his job, especially cleaning the corners and edges of the elevators.  Cotton denies that he received this training or the one on May 8, 2003.  On August 27, 2003, LeMar filed a written disciplinary report against Cotton, stating that he had failed to adequately clean the  6 North elevator tracks on August 26, 2003 and placing him on 90 days of probation.  On August 28, 2003, another written warning was issued against Cotton, this one for failing to properly clean the tracks on the 5 South elevator on August 27, 2003.  On September 3, 2003, Cotton

received a third written warning, this time for failing to properly clean the tracks on the 4 North elevator on September 2, 2003. On the day each written warning was issued, counseling sessions were held with Cotton to explain why the warnings were issued. Following several of these counseling sessions, Gray and Cotton met with Flanagan and other HHS supervisors to discuss the warnings.

On September 4, 2003, Cotton was given another written warning for insubordination which cited his failure to come to the office when asked to do so by a member of management. That day, he was terminated from HHS. According to Flanagan, the reasons for his termination were continued failure to satisfactorily perform his duties and failure to follow a supervisor's instructions during a probationary period. Also according to Flanagan, following Cotton's termination, a meeting was held with Cotton and Gray during which they requested that HHS rehire Cotton and give him a job as a floor technician. Flanagan did not consider this to be a viable option since Cotton's failure to perform that job led to his first termination in January 2003.

Cotton claims that he was not paid for the overtime he worked. His normal hours were 5:00 p.m. to 1:30 a.m., with a half-hour break. He was required to clock in and clock out at a time clock using his identification badge and also to manually sign-in using the same time shown on the time clock. Time clock records show that from September 1, 2001 to September 4, 2003, Cotton worked a total of 63.75 hours of overtime. Payroll records show that for that period of time, Cotton receive compensation at time and a half for 63.75 hours

of overtime. Other than the time clock records, there is no other evidence of the number of hours Cotton worked overtime.

### IV. Discussion

*A. ADA Claim*

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In analyzing an ADA claim of discrimination, the test to be applied is the familiar burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999).

First, the plaintiff must establish a *prima facie* case of discrimination. In the context of ADA claims, a plaintiff must show that (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).

The ADA defines "disability" in three ways: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such impairment. 42 U.S.C. §12112(a). For the purpose of its Motion for Summary Judgment, HHS does not dispute that Cotton is disabled due to mental

retardation and that such disability was known to it.[2]  Thus, the Court assumes that Cotton has met his burden on the first prong of the *prima facie* case.

The term "qualified individual" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds. 42 U.S.C. § 12111(8).  "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform."  *Earl*, 207 F.3d at 1365.  The essential functions of an elevator technician include sweeping, mopping, and buffing the elevator floors; cleaning the inside of the elevator doors; cleaning the light covers, and; cleaning between the tracks of the elevators.  The parties do not dispute that Cotton could perform these functions, therefore Cotton has met his burden on the second prong of the *prima facie* case.[3]

The third prong of the *prima facie* case requires that the plaintiff show that he was subjected to unlawful discrimination because of his disability.  That is, the plaintiff must show that he has suffered an adverse employment action because of his disability.  *Doe v.*

---

[2] In his Complaint, Cotton alleged that he had been diagnosed with Down's Syndrome. However, he testified in his deposition that he did not know if he had ever been diagnosed with Down's Syndrome and he has provided no documentation showing a diagnosis of Down's Syndrome.  Cotton does not mention Down's Syndrome in his Memorandum Brief in Opposition of Defendant's Motion for Summary Judgment.  Therefore, the Court assumes that Cotton no longer asserts that he has Down's Syndrome and will not address the issue further.

[3] Because the parties agree that Cotton could perform the essential functions of the position, the issue of "reasonable accommodation" is irrelevant to this prong of the *prima facie* case.

*DeKalb County. Sch. Dist*, 145 F.3d 1441, 1445 (11th Cir. 1998).[4] It is well-settled that termination is considered to be an adverse employment action. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Thus, the issue is whether Cotton has shown that he was terminated *because of* his disability. Cotton's basic argument is that HHS wanted to terminate him because of his disability, and therefore set him up to fail.

First, Cotton argues that he was set up to fail by being placed into the position of elevator technician, a position he asserts was more "demanding and demeaning" than the position of floor technician that he held prior to his first termination. He alleges that HHS placed him in this position knowing that he could never produce satisfactory results, thereby making it easier for HHS to support his termination. Flanagan admits that the position was more detail-oriented than the floor technician position, which is some evidence that the job was more demanding. Cotton provides no evidence that the elevator technician position was considered to be more demeaning. Second, Cotton argues that he was required to use a toothbrush and butter knife to perform his job, instead of a detail brush and putty knife

---

[4]Judge Vining of the Northern District of Georgia has pointed out that this formulation of the third prong seemingly requires that plaintiff to prove his entire case as part of his *prima facie* case. The Court agrees with Judge Vining that the third prong should instead require the plaintiff only to show that an adverse employment action was taken (as in the context of other types of employment discrimination), not that the action was taken because of his disability. *See Brandon v. Lockheed Martin Aeronautical Sys.*, No. 1:04-CV-2162-RLV, 2005 WL 2420515 (N.D. Ga. Sept. 29, 2005). However, the Court is required to follow Eleventh Circuit precedent, and will therefore apply the third prong as stated in *Earl*. Though it has consistently stated the third prong as above, the Eleventh Circuit has interpreted it simply to require a plaintiff to present facts from which an inference of discrimination can be made. *Id.* at *1. Therefore, that is the standard which the Court will apply here.

normally used by elevator technicians. Third, Cotton alleges that his work was not inspected often enough. That is, because the elevators were used so frequently, they became dirty before Cotton's work was inspected, and therefore he was doomed to fail at his position. Cotton agrees with HHS that other areas of the hospital were inspected with the same frequency as the elevators, but asserts that the elevators should have been inspected more frequently than other areas of the hospital because of the frequency of their use. Viewing all of the above facts in the light most favorable to Cotton, a reasonable fact-finder could determine that HHS set him up to fail at his position and infer that it did so because of his disability.

The burden now shifts to HHS to provide a legitimate, nondiscriminatory reason for its actions. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50, 124 S.Ct. 513, 518, 157 L.Ed.2d 357 (2003). As to Cotton's placement into the position of elevator technician, HHS asserts that it was giving Cotton a second chance by rehiring him and that he was given the position of elevator technician simply because it was an open established position in which Cotton would not be supervised by his former supervisor Clarke. As to the tools Cotton used, HHS does not believe that Cotton was provided with a toothbrush and butter knife, but is not certain that it did not happen. However, HHS claims that even if Cotton did use a toothbrush and butter knife, detail brushes and putty knives were readily available to all employees and that there is no evidence that Cotton's inability to perform his job was related to the tools he used. As to the frequency of inspections, HHS claims that various areas of the

hospital were inspected each morning, not just the elevators that Cotton worked on, therefore the frequency of the inspections of Cotton's work had nothing to do with his disability. HHS further claims that the individuals inspecting the elevators were looking for built-up dirt and grime, not for spills or loose dirt that could have accumulated between the time of cleaning and inspection. Finally, HHS asserts that Cotton was terminated because he did not meet the performance standards for the position. HHS provides evidence of Cotton's poor performance in the form of the numerous written warnings that were issued against Cotton. This is enough evidence for a reasonable fact-finder to conclude that HHS's actions were taken for a legitimate, nondiscriminatory reason.

Thus, the burden shifts back to Cotton to show that the HHS's explanation is pretextual and that the real reason for its actions was discriminatory. *Id.* The only evidence Cotton sets forth showing that HHS's explanation is pretextual are his and Gray's own assertions. A plaintiff's own allegations are simply not sufficient to demonstrate discrimination by the defendants. *See Earley v. Champion Internat'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (stating that "the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice."). Since Gray is a close relative and caretaker of Cotton, her bare allegations are equally insufficient to show pretext. Therefore, even viewing the facts in a light most favorable to Cotton, he has not met his burden of proving that the HHS's reason for terminating him was pretextual and summary judgment

is due to be granted in favor of HHS on Cotton's ADA claim.

*B. FLSA Claim*

In his Complaint, Cotton alleges that HHS violated the FLSA by failing to pay him overtime pay for the times he worked more than forty hours a week. HHS put forth evidence showing that Cotton worked a total of 63.75 hours of overtime from September 1, 2001 to September 4, 2003 and that he received compensation at time and a half for 63.75 hours of overtime. In his Memorandum Brief in Opposition of Defendant's Motion for Summary Judgment, not only does Cotton not dispute this evidence, he does not even discuss the FLSA claim. Therefore, summary judgment is due to be granted in favor of HHS on Cotton's FLSA claim.

## IV. Conclusion

For the reasons set forth above, it is hereby ORDERED that HHS's Motion for Summary Judgment (Doc. # 25) is GRANTED.

DONE this 18th day of October, 2005.

                                                  /s/ Mark E. Fuller
                                      CHIEF UNITED STATES DISTRICT JUDGE